[No. 23367.   Department One.   February 5, 1932.]

THE CITY OF SEATTLE, *Appellant,* v. PACIFIC STATES
LUMBER COMPANY, *Respondent.*[1]

[1]Reported in 7 P. (2d) 967.

*A. C. Van Soelen, J. Ambler Newton,* and *Glen E. Wilson,* for appellants.

*Preston, Thorgrimson & Turner* and *Hayden, Langhorne & Metzger,* for respondent.

HERMAN, J.—The city of Seattle, plaintiff, sued the Pacific States Lumber Company, a corporation, alleging that defendant is wrongfully removing timber from lands owned by plaintiff; that plaintiff has been damaged thereby in the sum of five hundred thousand dollars; that the conduct of defendant in its logging operations constitutes a public and private nuisance, which is continuously recurring. Plaintiff prayed for judgment for its damages in the sum of five hundred thousand dollars; that said damages be trebled in accordance with Rem. Comp. Stat., § 939; and for a decree of court ejecting defendant from the lands of plaintiff and abating the nuisance being committed by defendant. The cause was tried to the court without a jury, and resulted in judgment for defendant. From this judgment, plaintiff appeals.

Appellant has made seven assignments of error, and has discussed its claim of error under four headings, or claims. The first of these claims is that the standing timber is a part of the water utility; the second is that an *ultra vires* contract is not subject to ratification or estoppel. We will discuss these two claims first.

In considering the assertion that the standing timber is a part of the water utility, we will review briefly the history of the organization, acquisition and operation of the Seattle municipal water-works system, as disclosed by the testimony in the case. A fair summary of the facts established by the evidence follows:

Appellant was authorized by the state of Washington to acquire and operate a municipal water-works plant,

and did acquire and does operate such a plant and system of the value of more than twenty million dollars. Cedar lake is part of appellant's water-works system, and is used as a catch basin and impounding reservoir for the storage of water.

In 1895, appellant decided to make Cedar river the source of its water supply. This decision appellant manifested by the passage by the council of ordinance No. 3990, which was approved by the voters. That ordinance provided, among other things, for head-works on Cedar river, for the use of Swan lake (now lake Youngs) for reservoir purposes, and for a pipe line. It estimated the cost of the construction and acquisition of lands, rights and privileges necessary therefor at one and a quarter million dollars. It provided that the cost was payable only in warrants upon a fund then created, known as the Cedar river water supply fund of Seattle, out of which payment should be made for any real estate rights, easements or privileges necessary; that seventy-five per cent of the gross revenues of the system was set apart into that fund, and the fund pledged to the retirement of warrants, principal and interest.

The plant was constructed, and all of the one and a quarter million dollars, except about seventy-five thousand dollars, was spent for that purpose. The amount so expended was all spent for construction purposes, the right of way for a pipe line, and for the purchase of reservoir sites in the city, save and except the comparatively small sum of fifteen thousand dollars, which was the cost of the land purchased for intake purposes.

In 1900, appellant decided to extend the system to Cedar lake and its watershed and Cedar river above the intake. This decision was manifested by ordinance No. 5803, passed by the council and approved by the

electors, which provided that the unexpended portion of the estimated cost of one and a quarter million dollars provided by ordinance No. 3990, heretofore referred to, might be used for the extension of the system. At the time this latter ordinance extending the system was arrived at, it would have cost over five million dollars to have acquired the timber standing upon the lands in the Cedar river and Cedar lake watersheds above the intake.

Appellant acquired no land or timber in connection with the Cedar river project, except the land at the intake, until 1899. From 1899 to 1911, the city acquired several thousand acres of land. In most of these acquisitions the city procured the land only, the timber being either reserved to, or deeded by the city to, the original owner. In such instances, the transactions were so arranged that the owner of the timber was privileged to remove the timber in later years, with the right to construct logging railroads and logging roads over the lands so acquired by the city, such right of way also extending to other lands then owned by the city or thereafter to be acquired by it. The arrangements for future logging operations provided they should be conducted in such a way as to avoid pollution of the water supply, and to that end be under supervision of and regulation by the city authorities. It was specially provided that this logging privilege was confined to timber then standing, and excluded the right to log any new growth of timber.

Pursuant to the provisions of an amended city charter, ordinance No. 7708 was passed by the city council and approved by the electors, authorizing the construction of a municipal hydro-electric plant, near the foot of Cedar lake, at an estimated cost of five hundred ninety thousand dollars, to be paid for in general bonds. The project was completed in Novem-

ber, 1904. A part of the system was the erection of a crib dam at the lower end of the lake. The city removed and used for building the dam, the power house and other structures, timber it had acquired near the dam site.

In September, 1910, it was decided to enlarge the hydro-electric plant. This decision took the form of ordinance No. 25009, passed by the city council and approved by popular vote. The new plan involved raising the waters of the lake. At that election, the electors voted that the lands to be submerged, in accordance with the plan to enlarge the hydro-electric plant, should be cleared of timber. To accomplish that purpose, and for that purpose only, the city began for the first time to acquire timber standing on lands which it had previously procured, and also additional land and timber to be affected by the raising of the lake level.

In 1911, the city council passed, and the electors confirmed, ordinance No. 27499, authorizing the acquisition of lands, properties, rights and privileges within and near the watershed at Cedar river necessary to be had in order to protect the existing water supply system from pollution, and authorizing the issuance of general bonds. Thereupon, the city commenced acquiring additional lands in the watershed. Ordinance No. 27499 estimated the cost of such acquisitions at one million dollars, and authorized the issuance of general bonds to that amount.

The watershed comprises about ninety thousand acres of land, of which about fifty thousand acres are tributary to Cedar lake and known as the upper watershed, and forty thousand acres are tributary to Cedar river below the lake and known as the lower watershed. The United States government owned approximately twenty-four thousand acres of the upper area of the watershed. Appellant acquired approx-

imately sixty thousand acres of the watershed, acquiring the land only for the largest part of its holdings. To have secured all the timber in the watershed, or any considerable portion thereof, would have imposed a prohibitive cost, and would have resulted in the imposition upon water users of prohibitive rates.

In the course of its acquisition of land without timber, the city purchased a quantity of land from Weaver and associates, the grantors reserving the timber with the right to log it. A considerable part of this timber was to be affected by the raising of the lake level. An arrangement was made with Weaver whereby the city should procure the timber for seventy-five thousand dollars, payable in bonds issued under ordinance No. 27499, heretofore referred to as having been passed by the city council and ratified by the electors in 1911. Ordinances were passed to that effect.

Appellant's bond attorneys in New York City questioned the validity of the issuance of the seventy-five thousand dollars to procure timber, for the reason that it was not made to appear that the acquisition was for the benefit of the water system. Thereupon, the city repealed those ordinances and enacted ordinances in their place, one of which (No. 32473) contained a recital that it was necessary to acquire the Weaver timber to protect the existing water supply system from pollution. The purchase was then concluded.

The only reason for the recital aforesaid was to obviate the objection raised by the New York attorneys, and it was not made for the purpose of indicating an actual change of policy on the part of the city in respect to the watershed and timber thereon. Some of the Weaver timber was on land to be submerged, and some was on higher land, but the entire holding was purchased as a matter of necessity in

order for the city to acquire the timber which it needed and which was to be cleared under the mandate of the electors.

During the same period, the city was granted by Congress the right to purchase the government land and timber in the watershed, paying for the timber the value to be fixed thereon by appraisal. This acquisition involved so large a sum of money that it could not be accomplished without financially overburdening the system and producing higher water rates to consumers. So later the city relinquished that right to the government.

About this same time, the city let a contract to a company, not the respondent, to remove all timber standing upon the area to be submerged and for a short distance above it, which contract was carried out.

The Northern Pacific Railway Company owned approximately twenty thousand acres of land in the upper watershed, with the timber thereon. In the course of its aforesaid acquisition of land without timber, the city procured this land from the railroad company, the grantor reserving the timber then standing. In connection with this transaction, an agreement was made between the city and the company whereby the two timber ownerships were to be logged together, and to that end either party might build logging railroads across any lands then owned or afterwards acquired by the city.

By the same contract, the railroad company granted the city an option to purchase certain of this reserved timber, including some standing near the lake shore. After discovering that this timber was not needed on account of the raising of the lake level, the city released this right of purchase, for the purpose expressly stated that the railroad company should sell

the same to the respondent in this action to be by it logged.

In numerous instances, during the period of years involved in the acquisition of the watershed land, the city sold timber, standing on land acquired with timber, to various purchasers in order that it might be removed.

None of the three ordinances, No. 3990, passed in 1895, No. 5803, passed in 1900, and No. 27499, passed in 1911, contained any specific description of land or any reference to timber, but the selection of land and the inclusion or exclusion of timber was left to the discretion of the city council.

In 1917, much of the timber in the lower watershed had been removed, and the city owned 8,555 acres of timber in the upper watershed, of which 7,210 acres were merchantable. There was in private and government ownership in the upper watershed, at the same time, approximately forty thousand acres of timber, the owners of which had the right and the intention to log the same. To have acquired this privately owned timber at that time, would have cost the city upwards of five million dollars, which would have constituted a prohibitory burden upon the finances of the water system.

That same year, 1917, the city council, by ordinance, directed the calling for bids for the removal of the city owned timber. The bid of respondent was accepted, and in November of that year a contract to remove the city owned timber was entered into and approved by the corporation counsel of the city of Seattle and by ordinance. Respondent then owned and afterwards acquired extensive holdings of privately owned timber in the watershed. The contract required respondent to log the city timber and the privately owned timber in a single logging operation.

This was done, and, up to and including the first nine months of 1930, forty-three hundred acres of city owned timber had been removed.

At the time of the trial of this action in the superior court, there remained 2,910 acres of merchantable timber described in the contract of November, 1917. Prior to the time of trial, and subsequent to the making of the contract last mentioned, the United States supreme court had declared 430 acres affected by that contract to be the property of the United States government. In 1928, an amended contract was entered into whereby certain of the government owned timber was eliminated from the November, 1917, contract, and as to certain other government owned timber, it was provided that the respondent should proceed with the removal of the same, paying the city the contract price thereof.

At the time of trial, there remained only 2,480 acres of city owned merchantable timber uncut under the contract.

The logging operations by respondent under its contract with the city continued without interruption to the time of the trial, and the people of Seattle continuously acquiesced in those operations until this suit was brought in 1930.

In order to carry out its contract with appellant, respondent has expended over two million dollars. This money respondent has expended in good faith, relying upon its contract and upon the acquiescence of appellant and its officials and citizens in the contract and in the continued performance thereof. While performing the contract, respondent paid appellant more than seven hundred seventy-five thousand dollars, which appellant placed in a sinking fund for the redemption of the one million dollar bond issue.

Should respondent log the remaining 2,910 acres, ac-

cording to the terms of agreement between it and appellant, it will pay to the city approximately five hundred thousand dollars more. This, together with the amount already received, will retire the one million dollar general bond issue, and very largely take care of the interest on such bonds. Through carrying out the contract in question, the city will ultimately acquire ownership of the lands in the watershed, except the United States government lands, practically without cost.

In accordance with the contract of 1917, and in order to perform the same, the respondent has built in the watershed a logging railroad, and extended the same from time to time, investing in that railroad almost a million dollars. This railroad is necessary for the preservation of old and new growth timber, and the city has continuously used it for fire protection and sanitary patrol purposes.

The city offered expert testimony that a forest cover is a necessary part of a municipal watershed; that forest cover regulates the runoff so as to conserve water for the summer months, prevents erosion of the soil and consequent discoloration, keeps lower the temperature of the water, and, by reason of the lower temperature, prevents an increase of the growth of animal and plant life, the presence of which in undue quantity detracts from the good taste of the water, and somewhat tends to the possibility of the presence in the water of objectionable disease germs. The respondent introduced expert testimony to the contrary. The city of Seattle does now, and for some time prior to the trial, did maintain a chlorination plant of modern type of construction and operation. The city, in order to safeguard the purity of its water, would still resort to chlorination, even though no logging should go on in the watershed. The water supply of

appellant is clear, pure and in all respects of the highest quality, and the quantity of water is more than sufficient to supply three times as many consumers as are now supplied from it.

Considering all the circumstances connected with the history of the acquisition and operation of the water system, we find that the city never acquired the standing timber with the intent that it should become a part of the municipal water system. We find that the standing timber was acquired not as a part of, but as an incident to, the water system. We conclude that, at the time the timber was sold, it was not, in fact, a part of the water system. The trial court made findings with reference to the relationship of the standing timber to the water system, which findings were justified by a clear preponderance of the evidence, and are as follows:

"(12) It was never the thought or intent of the voters that the timber in the watershed should be acquired as a part of the water system. On the contrary, the intent was that the land should be acquired without the timber; that the private owners of timber would remove the same from the land. The land would naturally and in due season be reforested and ultimately the city would thus become the owner of a forested watershed at a cost comparatively nominal and well within the financial resources of the city and the economical possibilities of the situation."

"(18) Up to the time of the letting of the contract to the defendant hereinafter referred to, the city authorities, including the voters, had pursued a consistent unbroken policy of either acquiring the land alone or where the timber was incidentally acquired for one purpose or another, to have the timber removed by sale or contract, but never up to that time did the city authorities nor the voters ever intend to acquire any timber in the watershed for the purpose of retaining the same or making same a part of the water system, and any timber so acquired did not in intent or in fact

become a part of the water system. In none of the three ordinances, 3990, 5803 or 27499, was there any specific description of land or any reference to timber, but the selection of land and the inclusion or exclusion of timber was left to the discretion of the city council. In the exercise of that discretion the city determined that the timber was not a necessary part of the water system. In so determining, the city council acted prudently, reasonably and in every respect in the best interests of the city, and in no respect was their action in making such determination arbitrary, capricious or unreasonable. The said city owned timber is not and has never been a necessary or integral part of the city's water system."

Had appellant been correct in its contention that the standing timber is a part of the water utility, it would have followed that those sections of the statutes hereinafter referred to as the act of 1917 (Rem. Comp. Stat., § 9512 *et seq.*) would have applied to the transaction at bar. Section 9512, Rem. Comp. Stat., in part provides:

"It is and shall be lawful for any city or town in this state now or hereafter owning any water works . . . to sell and convey the same or any part thereof, with the equipment and appurtenances, in the manner hereinafter prescribed."

The act of 1917 requires that a sale of a municipal waterworks, or any part thereof, shall be submitted to the voters of the city or town, and shall require the approval of a majority of the voters voting thereon. The contract between appellant and respondent in the case at bar was not submitted to the voters of Seattle for their approval.

We will now discuss the question whether the city had power, without popular vote, to dispose of any property acquired in connection with, but not as a part of, its water system. Rem. Comp. Stat., § 8966, subd.

3, gives to Seattle and similar cities the power to acquire

" . . . such lands and other property as may be necessary for any part of the corporate uses provided for by its charter, and to dispose of any such property as the interests of the corporation may from time to time, require."

Appellant's city charter, article I, § 1, provides that,

"The city of Seattle . . . may purchase, receive, hold and enjoy real and personal property within and without the corporate limits of the city of Seattle, and may sell, convey, mortgage and dispose of the same for the common benefit . . ."

In *State ex rel. Kent Lumber Co. v. Superior Court,* 46 Wash. 516, 90 Pac. 663, discussing a right of way across the Cedar river watershed, the court said:

"It appears, that the city has granted its permission for a right of way to respondent company; that the city has power to acquire property or to dispose of the same as the interests of the same require. Pierce's Code, §§ 3728, 3732, 3735 (Bal. Code, §§ 735, 739, 742); § 1 of the city charter."

To hold that the city did not have the right to dispose of anything which had ceased to be a part of the water system, or which happened to be standing on lands embraced in the water system and was merely an incident to, but not a part of, the water system, would require that the act of 1917 be interpreted as having deprived the city of the right to manage and control the water system. The statutes referred to as the act of 1917 indicate no such intention on the part of the legislature, which, by those statutes, conferred upon any city or town in this state, now or hereafter owning any waterworks, the right to sell and convey (subject to the approval of a majority of the voters) "the same or any part thereof, with the equipment and appurtenances."

The words "equipment and appurtenances," in connection with the sale of a part of the utility, are indicative that the legislature had in mind a sale of some operating part or unit of the whole property "with the equipment and appurtenances." To interpret the act of 1917 otherwise would require the people of Seattle to administer by their votes each of the utilities owned by the municipality. This was not the intention of the legislature.

In view of our determination that the standing timber was not a part of the municipal water system, but was merely incidental thereto, and that the city had the power to dispose of the standing timber as it did by its contract with respondent, appellant's claim that an *ultra vires* contract is not subject to ratification or estoppel ceases to be germane to a consideration of the case at bar.

Appellant's third claim is that appellant was entitled to a jury trial. In *Lindley v. McGlauflin*, 57 Wash. 581, 107 Pac. 355, the court said "that the nature of the trial is determined from the entire pleadings, rather than from the complaint alone." The court announced, in *Thiel v. Miller*, 122 Wash. 52, 209 Pac. 1081, 26 A. L. R. 523:

"The nature of an action as to its being one at law or in equity is determinable, not by the complaint alone, but by a consideration of all of the issues raised by all of the pleadings."

In the case at bar, the complaint, after alleging the ownership of the land and timber in the city as a part of its water utility, alleged that respondent was wrongfully and unlawfully removing the timber therefrom, and would continue to do so unless and until ejected from the land and premises, and that the operations of respondent constituted a nuisance. The complaint contained a prayer for damages and a prayer

" . . . that an appropriate decree be entered by this court abating said nuisance and ejecting said defendant, its agents, servants and employees from the lands, property and premises of the plaintiff."

The answer admitted that respondent was removing the timber, but pleaded, in justification, that it was doing so under a contract with appellant, and further alleged that the timber was not a part of the water utility, and that appellant had, by a uniform policy followed through many years, determined that the timber was not a necessary or integral part thereof. The answer further set up certain actions of respondent in reliance upon the contract, by virtue of which it claimed appellant was estopped from denying the contract.

The reply admitted the passage of the ordinance directing the execution of the contract, but alleged that the same had never been submitted to the voters for approval, as required by law, and that the contract was therefore *ultra vires* and void.

A study of the pleadings convinces this court that they indicate a purpose on the part of appellant to recover damages for timber already cut, and to have entered an appropriate decree prohibiting respondent from the further cutting of timber. In view of the contract (exhibit A referred to in and attached to respondent's answer), the execution of which document was admitted in the reply, such a decree could not be entered without annulling the contract between the city and respondent. The real purpose of the action, as disclosed by all the pleadings, was the annulment of the contract between appellant and respondent. This could be accomplished only by invoking the equity powers of the court. We are of the opinion the trial court did not err when it denied appellant a trial by jury.

■ Appellant's fourth claim is that the court erred in excluding evidence of seepage losses from the upper watershed, and in denying appellant's motion to reopen its case in chief for the purpose of introducing such evidence.

During the latter part of the trial, appellant offered to prove by Mr. Ober, one of the city's experts:

"First, that the actual increase in the mean annual run-off of the Cedar lake drainage basin for the second period of thirteen years exceeds the mean annual run-off for the first period of twelve years by approximately 2,000 acre feet;

"Second, that this same result is arrived at by the quantitative method when the quantity of loss from seepage in Cedar lake for the two periods is accounted for;

"Third, that the distribution of the run-off of the Cedar lake drainage basin for the different months of the year is approximately the same as shown by plaintiff's exhibit Q-8, when the seepage loss for the two periods is accounted for."

Appellant first sought to introduce the evidence contemplated by the offer to prove, as rebuttal to testimony offered by respondent. The trial court held the testimony was not proper as rebuttal. A painstaking perusal of the testimony convinces us that the trial court was correct in this ruling.

Appellant thereupon moved to reopen its case and introduce such testimony. Respondent's counsel contended that it would require at least six weeks of preparation to meet such testimony. A consideration of the nature of the testimony, as gathered from the discussion of counsel relative to its admissibility, indicates that considerable time would be required to meet appellant's new theory predicated upon the city's offer to prove. In ruling on the motion to reopen the case, the trial court said:

"To do this I feel that I would have to extend the time unduly in order to give the defendant a proper time to prepare, so I will deny your motion to reopen the case."

The offer to prove and the ruling thereon were made December 16, 1930. The trial had been in progress since November 6, 1930, and the proceedings therein prior to the offer to prove are set forth on more than 3,022 pages of the statement of facts. In *Field v. Field*, 163 Wash. 115, 300 Pac. 532, it was held that a denial of a motion to reopen the case for the introduction of further testimony was a matter within the discretion of the trial court, subject to review only for an abuse of discretion. We find no evidence indicating an abuse of discretion in the refusal to permit the re-opening of appellant's case.

The judgment is affirmed.

TOLMAN, C. J., MITCHELL, PARKER, and BEELER, JJ., concur.